**No. 53545.**—H. Fendrich *v.* United States, protest 116113–K (Indianapolis).

MOLLISON, Judge: When this case was originally submitted for decision, a careful review of the evidence was made by this division and it was found that upon a point vital to determination of the issues, which point was raised in the brief filed on behalf of the defendant, the record was silent. In the interests of justice the case was accordingly restored to the docket for the purpose of permitting the introduction of evidence upon the point. This was done, and the case again submitted for decision.

This issues and the evidence offered up to the time of the original submission of the case were fully set out and discussed in the memorandum accompanying our order restoring the case to the docket, and for convenience that memorandum, appearing in 18 Cust. Ct. 200, Abstract 51734, is reproduced herewith and adopted as part of this opinion:

In December 1943, the plaintiff (a corporation) in this case imported into the United States 91 bales of leaf tobacco from Cuba. It was all invoiced as "unstemmed fillers tobacco" and was entered as unstemmed filler tobacco at the rate of 28 cents per pound under the provisions of paragraph 601, Tariff Act of 1930 (19 U. S. C. 1940 ed. §1001, par. 601), apparently as amended by the trade agreement with Cuba reported in T. D. 50541. It was classified by the collector as unstemmed filler and wrapper tobacco mixed, and assessment was made on the portion determined to be filler tobacco at the rate of 14 cents per pound under the provisions of paragraph 601, as amended, *supra*, and on the portion determined to be wrapper tobacco at the rate of 91 cents per pound under the provision for unstemmed wrapper tobacco in the same paragraph, as amended. It should be noted that the difference between the entered and assessed rates on the portion of the tobacco found by the collector to be unstemmed filler tobacco was due to the fact that an agreement in force at the time of importation between the United States and Cuba (T. D. 50050) provided that an annual quota of 22,000,000 pounds of filler tobacco would be entitled to the reduced rate, and that the tobacco was entered at the nonquota rate but was found to be entitled to the quota rate.

The protest at bar is directed against the assessment of duty made by the collector on that portion found by that officer to be wrapper tobacco, the claim being that such tobacco was, in fact, unstemmed filler tobacco, dutiable at the rate of 14 cents per pound.

On the consular invoice the tobacco was divided into seven lots, containing respectively 46, 7, 4, 14, 4, 6, and 10 bales, or a total of 91 bales. The bales covered by the third and seventh lots, 14 bales in all, were found by the collector to contain only filler tobacco. The bales covered by the second lot, seven in all, were found to contain 8 percent wrapper tobacco, and the bales covered by the first, fourth, fifth, and sixth lots, 70 in all, were found to contain 10 percent wrapper tobacco.

Paragraph 602 of the tariff act contains a definition of the terms "wrapper tobacco" and "filler tobacco" as follows:

> The term "wrapper tobacco" as used in this title means that quality of leaf tobacco which has the requisite color, texture, and burn, and is of sufficient size for cigar wrappers, and the term "filler tobacco" means all other leaf tobacco.

In the same paragraph are set forth statutory requirements for examination of leaf tobacco for classification purposes as follows:

> * * * In the examination for classification of any imported leaf tobacco, at least one bale, box, or package in every ten, and at least one in every invoice, shall be examined by the appraiser or person authorized by law to make such examination, and at least ten hands shall be examined in each examined bale, box, or package.

The bales covered by the shipment in question were numbered 50818 to 50908, inclusive. It appears that the plaintiff was instructed by the customs officers to provide for the statutory examination the following 13 bales:

| | |
|---|---|
| 50854/6 | 50885 |
| 50859/60 | 50889 |
| 50865 | 50894 |
| 50871 | 50899/900 |
| 50882 | |

and examination of the same was made by Customs Examiner Brice Lane at the plaintiff's warehouse in Evansville, Ind., on January 18, 1944, less than a month after importation of the merchandise. It is apparent that Mr. Lane's advisory return is the basis of the classification adopted by the collector.

In the presentation of its case the plaintiff offered in evidence documents purporting to be the written statements of three persons made under oath relating to the tobacco at bar. Upon objection to the admission of the same made by counsel for the defendant, the judge presiding at the hearing on circuit ordered the documents marked for identification, reserving decision on their admissibility for the division having cognizance of the subject matter.

Probably nothing in our American system of evidence is more fundamental than the requirement that testimonial assertions, sought to be given probative

value, must be subjected to certain tests, the chief one of which is cross-examination, which experience has shown to be necessary in order to establish their value. Although the statements in question appear to be under oath, they are extrajudicial, and were made under circumstances which prevented the application of the safeguarding test of cross-examination. As offered in this court, they are nothing more than hearsay, and as the circumstances do not bring them under any of the well-recognized exceptions to the hearsay rule, and as there is no exception created by statute applicable to cases arising under section 514, Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1514), as does the case at bar, the objections made by counsel for the defendant are sustained and the documents denied admission into evidence.

There was also offered in evidence on behalf of the plaintiff a copy on a single sheet of what was stated by the secretary of the plaintiff corporation to be the private invoices given by the seller of the tobacco at bar to the purchaser, the plaintiff corporation. No objection to this was made by counsel for the defendant on the ground that it was a copy, but objection was made on the ground "that it is a self-serving declaration." During the course of the discussion concerning the document at the time it was offered, it was said that the same described the merchandise as "filler tobacco." The judge of this court presiding at the hearing on circuit ordered the document marked for identification and reserved ruling on its admissibility for this division of the court. A careful examination of the document as offered fails to disclose that the merchandise is described thereon as "filler tobacco," although it does appear to describe the merchandise as "Unstripped Havana Vueltas Tobacco," whatever that may mean.

It is clear, however, that the document was offered in connection with one of the sworn statements already referred to and which had been denied admission into evidence, and we are constrained to, and do, make the same ruling in connection with the said document.

Three witnesses testified on behalf of the plaintiff on the issue of whether or not any of the tobacco in issue consisted of wrapper tobacco within the meaning of the term as set out in the statute. The first of these was Antonio F. Bello. From his testimony it appears that he was employed by the plaintiff corporation, but in what capacity was not brought out. He stated that he saw the 91 bales of tobacco in the warehouses of the plaintiff corporation in Evansville, Ind., and that he "was handling it."

He testified that he had 32 years' experience handling tobacco and knew the difference between wrapper and filler tobacco, having handled them over all those years. It is difficult to determine from the record as made Mr. Bello's exact relationship to the merchandise in question. He said that "We used it—about 62 bales, if I'm not correct," and that he tested it for burn but apparently not from the standpoint of whether the burn would be suitable for wrapper tobacco. He found the tobacco to fulfill the requirements as to size, but as to color and texture he found the tobacco to be unsuitable for wrapper tobacco, the color being "very dark, brownish like, spotty, like filler tobacco is," and the texture to be too coarse for wrapper. He said he would not use that tobacco as wrapper, but could use it as binder or as filler tobacco.

For the purpose of obtaining further oral evidence by qualified witnesses, plaintiff caused the 13 bales of tobacco, which had been set aside under instructions of the customs officials for the purpose of examination for classification in accordance with the statute, to be shipped from its warehouse in Evansville to the warehouse of C. C. Hamilton & Co. in New York City. Documentary and oral evidence establishing the identity of the bales shipped in November 1945, and their return to Evansville in the following month, were offered and received, and it clearly appears that two witnesses, William Levison and Charles L. Meister, made an examination of a portion of the tobacco withdrawn from each of the said bales.

At the time of his testimony Mr. Levison was manager of the Havana department of H. Duys & Co., the sellers of the tobacco in issue. He stated that he had been in the Havana tobacco business for 30-odd years, and had packed, sorted, graded, bought, and sold such tobacco. As to his experience with the tobacco in question, he stated that he visited the Hamilton warehouse in New York, to which the tobacco had been shipped from Evansville, and saw the bales before they were opened, at which time they appeared to be in their original condition, so far as he could see, as to packing. Porters opened the bales and he had three carats (each carat containing four hands) taken indiscriminately, or without selection, out of each bale, and sent to his office where they were "cased," or moistened. This was necessary because the tobacco was dry. He then examined each leaf in the 39 carats and found no wrapper tobacco, but only binders and fillers. He appar-

ently did not test it for burn or size and gave no testimony as to texture. His testimony as to color of the tobacco is as follows:

Q. Now, what color did you find this tobacco to be? Describe its color, please?—A. Brownish color; brownish color. Don't forget that when tobacco matures and ripens, it gets brown.

Q. Was it a dark brown or a light brown?—A. Filler tobacco.

Q. Was it a dark brown or a light brown?—A. Dark.

Q. Dark brown?—A. Dark, and some of it was pretty black. (R. pp. 70–71.)

Charles L. Meister stated that he was the assistant secretary of H. Duys & Co., and had been in the tobacco business since 1906, during which time he had handled, bought, sold, and examined tobacco, including wrapper tobacco. He examined the 39 carats of tobacco, which Mr. Levison examined at the same time, and found that the leaves did not have the required width, nor the required tensile strength, nor the required color, nor the required burn to qualify as wrapper tobacco. He found the colors of the leaves to vary, including 'greenish, brownish." A wrapper, he said, is designated as a light color, a pleasing color, and cannot be dark, mottled, or variegated. He lighted some leaves with a match and found that they did not burn freely as wrapper tobacco should, but were satisfactory for filler, and found that the texture was not smooth or thin enough to permit the leaves to be used as wrapper.

The sole witness for the defendant was Brice A. Lane, the examiner of merchandise in the office of the United States appraiser at the port of Chicago, who made the original examination of the merchandise for the purpose of classification and assessment of duties. Mr. Lane had been examiner of tobacco, among other things, for 17½ years at the time of his testimony, and in the discharge of his duties examined all tobacco imported into the Third Tobacco District, which comprises, roughly, the central part of the United States. He testified that from each of the 13 bales ordered to be set aside he took 3 carats, or 12 hands, and examined them to determine size, burn, color, and texture. He tested the burn by lighting a match to the leaves and watching the spread of the fire, and also by making several cigars and wrapping the leaves on the cigars and noted how they would burn.

As to color, Mr. Lane testified that the requirement for wrapper tobacco would be that the leaf possess a uniform solid blend of color throughout the whole length and that the color range between claro and colorado claro. He found the texture to be good, with small veins and no minute pinholes. The percentages he returned represented the count of actual leaves which he found would answer the four requisites for wrapper.

It will be seen from the foregoing that there is apparently an irreconcilable conflict between the testimony given by the plaintiff's witnesses and that given by the defendant's witness. It is clear, of course, that some element of chance enters into the examination of tobacco and into the picture in this case, in view of the fact that, although the same bales were examined by Messrs. Lane, Levison, and Meister, the samples withdrawn from those bales by Examiner Lane and those withdrawn for examination by Messrs. Levison and Meister were not the identical samples. It would seem improbable, however, that a variance of zero and 8 or 10 percent would show up in the examination of tobacco coming from the same bales.

It is, of course, the court's duty to resolve the conflict, but prior to doing so, we find a seemingly vital question raised in the brief filed on behalf of the defendant. Counsel for the Government points out therein that the examination by Messrs. Levison and Meister took place 2 years after importation, and, citing the decision of this court in the case of M. Valle y Ca et al. v. United States, 47 Treas. Dec. 651, T. D. 40912, argues that such examination has not sufficient probative value to prevail over the examination made by the Government examiner.

The Valle case presented a situation wherein certain Cuban tobacco was examined by the customs officers immediately after importation, but the examination made on behalf of the plaintiff did not occur until some 2½ months after entry, and it appears that in the meantime no effort was made to protect the said tobacco from deterioration. This latter factor does not appear in the present case, and there is nothing in the record upon which the court could be informed whether, under the circumstances of this case, the time after importation within which the examinations relied upon by the plaintiff were made could have affected

the tobacco so as to cause a leaf which might have been classifiable upon importation as wrapper to be susceptible only of classification as filler. To put it in other words, there is no information on the question of whether an examination made 2 years after importation of bales packed, stored, and transported, as the tobacco in issue was, would reveal whether any of the leaves contained therein had been classifiable as wrapper tobacco upon importation.

As we view it, this is a matter for expert opinion, and not a subject for judicial notice. In the interests of justice, since the point seems to have been overlooked at the trial of the issues, we believe a proper course would be to restore the case to the next Indianapolis calendar of this court for the purpose of permitting, by either or both parties, the introduction of evidence on this very vital point.

On the question of whether the lapse of time between importation of the tobacco and its examination by plaintiff's witnesses would have affected the classification, plaintiff offered the testimony of Antonio F. Bello and of Modesdo Alonso. Mr. Bello, who, as will be seen from the memorandum above, had previously testified in the case on behalf of the plaintiff, was identified as the assistant superintendent of the plaintiff, who supervised all of the handling of tobacco and the manufacturing of cigars. His qualifications as an expert were conceded by the defendant. Mr. Alonso was a cigar manufacturer and leaf tobacco dealer of some 36 years' experience.

Mr. Bello testified that under the conditions of storage and transportation of the 13 examination bales in question, the tobacco would, in fact, have improved, and if there had been any wrapper tobacco therein at the time of importation there would have been wrappers at the time of examination 2 years later. Specifically, he testified that the burn would have improved, the size would not noticeably have changed, the color would have changed very little, and the texture would have been thinner.

Mr. Alonso had not examined any of the tobacco in issue, but his testimony as to the result of storage. and transportation was to the same effect as that of Mr. Bello, save that he pointed out that if the leaf was broken it would no longer be wrapper tobacco. Recalled later, Mr. Bello testified that the fact that the tobacco in the 13 examination bales was unsuitable for wrapper tobacco was not due to breakage of the leaves, and that such leaves as he found broken therein would not have met the requirements of wrapper tobacco if they had not been broken.

The defendant recalled Mr. Brice Lane, the examiner who made the examination and advisory classification of the tobacco in question. On direct examination Mr. Lane gave it as his opinion that under the conditions of storage and transportation of the 13 examination bales the tobacco would have deteriorated, but on cross-examination he admitted that if there had been no deterioration from breakage of the tips or sides of the leaves, and assuming there was no deterioration from worms, wrapper tobbaco present at the time of importation should be present as such at the time of examination in this case.

We are convinced from the evidence offered upon restoration of the case to the docket that the points and claims raised in the brief of the defendant are without merit, and that the presence of wrapper tobacco in the examination bales would have been revealed upon examination 2 years after importation under the conditions of storage and transportation involved in this case.

We therefore proceed to a determination of the issue as to the classification of the tobacco as wrapper or filler tobacco, allowing due consideration to the testimony given by the experts who made the aforementioned examination some 2 years after importation. Upon a consideration of the entire record, we are satisfied that a preponderance in weight of the evidence offered favors the contention of the plaintiff, i. e., that the tobacco as imported was unstemmed filler tobacco and that no wrapper tobacco was contained therein.

The protest claim for duty at the rate of 14 cents per pound under the provisions of paragraph 601 of the Tariff Act of 1930, as amended, is therefore sustained, and judgment will issue accordingly.

The matter of the jurisdiction of divisions of the court and of single judges on circuit in respect to protest cases has been dealt with and disposed of in the court's opinion in the case of *Geo. S. Bush & Co., Inc., et al.* v. *United States*, 22 Cust. Ct. 158, C. D. 1175.

### DISSENTING OPINION ON JURISDICTIONAL GROUNDS

COLE, Judge: I dissent because this case was tried at several sittings and finally submitted for decision before an individual member of this court—Judge Cline—while on circuit in Indianapolis to hear and determine cases assigned to that docket by the chief judge. This division, therefore, has no jurisdiction to dispose of the case, as it does herein. See my recent releases on the subject, i. e., *Geo. S. Bush & Co., Inc., et al.* v. *United States*, 22 Cust. Ct. 158, C. D. 1175, *Fuchs Shoe Corp.* v. *United States*, 22 Cust. Ct. 338, Abstract 53250, and *W. R. Zanes & Co.* v. *United States*, 22 Cust. Ct. 339, Abstract 53251.

The usurpation of authority by the division, instead of leaving the case with the individual judge before whom it was submitted for decision, is glaring enough as violative of the statute governing this court, 28 U. S. C. (1948 revision) § 254 (formerly section 518 of the Tariff Act of 1930 (28 U. S. C. 1946 ed. § 296)), but for the division to rule upon the admissibility of evidence taken before a single judge on circuit, as is done in the majority opinion, presents the most flagrant violation of the jurisdictional rights of an individual judge of this court while on circuit, ever released.